NOTICE: This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports. Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press. Errors may be reported by email at the following address: reporter@courts.state.nh.us. Opinions are available on the Internet by 9:00 a.m. on the morning of their release. The direct address of the court's home page is: http://www.courts.state.nh.us/supreme.

THE SUPREME COURT OF NEW HAMPSHIRE

_____

Grafton
Nos.   2020-0216
       2020-0352

TEJASINHA SIVALINGAM

v.

FRANCES NEWTON & a.

Argued: February 11, 2021
Opinion Issued: October 5, 2021

The Law Offices of Martin & Hipple, PLLC, of Concord (Stephen T. Martin on the brief and orally), for the plaintiff.

Gallagher, Callahan & Gartrell, P.C., of Concord (Charles P. Bauer and Anne E. Jenness on the brief and orally), for defendants Frances Newton and Leigh Sharps.

Mitchell Municipal Group P.A., of Laconia (Laura Spector-Morgan on the brief and orally), for defendant Town of Ashland Board of Selectmen.

DONOVAN, J. The plaintiff, Tejasinha Sivalingam, sued Frances Newton and Leigh Sharps (Selectwomen) and the Town of Ashland Board of Selectmen (Board), seeking the Selectwomen's dismissal from and injunctive relief against the Board. The plaintiff alleged that, after the Board discussed in nonpublic

session a complaint that he had submitted, information relating to that complaint was wrongfully disclosed in public session. The Superior Court (MacLeod, J.) granted the Selectwomen summary judgment, concluding that they had not improperly disclosed any information, but denied their motions for judgment on the pleadings and attorney's fees. The court also denied the Board's motion to dismiss for failure to state a claim, determining that the Board was required to notify the plaintiff of the nonpublic session. Relying upon Superior Court Rule 46(c), the court then severed the adjudicated claim against the Selectwomen from the plaintiff's pending claim against the Board. In these consolidated appeals, the plaintiff appeals the superior court's grant of summary judgment in favor of the Selectwomen; the Selectwomen cross-appeal, arguing that the court erred by denying their motions for judgment on the pleadings and attorney's fees; and the Board, on an interlocutory basis pursuant to Supreme Court Rule 8, appeals the denial of its motion to dismiss. For the reasons that follow, we affirm the superior court's decision denying the Selectwomen attorney's fees. However, we reverse its decisions denying the Selectwomen's motion for judgment on the pleadings and the Board's motion to dismiss.

## I. Facts

The following facts are undisputed or supported by the record. The plaintiff was a selectman on the Board from March 2017 until January 2018. The Selectwomen served on the Board at all relevant times. On May 12, 2018, the plaintiff submitted to the Board a "Citizen Inquiry" form, a method developed by the Board to address public grievances, in which he complained that, during his tenure on the Board, the Selectwomen treated him with "derision" following an interview that he conducted with a candidate for the Ashland zoning board. His complaint requested "a public apology on television" from the Selectwomen and that the Board "vote to formally censure" them.

On June 4, 2018, the Board unanimously voted to enter nonpublic session to discuss matters which "would likely affect adversely the reputation of any person" if discussed in public. See RSA 91-A:3, II(c) (2013). The minutes of the nonpublic session reveal that the Board discussed "[h]ow to deal with complaints from [the plaintiff and] others" and decided that, moving forward, it would "not address personal attacks in public." Determining that the divulgence of the nonpublic session minutes and decisions reached in nonpublic session would likely "[a]ffect adversely the reputation of any person other than a" Board member, the Board unanimously voted to seal the minutes of the nonpublic session.[1] See RSA 91-A:3, III (Supp. 2020). After reentering

---

[1] Based upon the record, it is unclear whether the Board's vote to seal the minutes and decisions reached in nonpublic session itself occurred in nonpublic session. We observe that RSA 91-A:3, III requires that such a vote be "taken in public session." Because neither party raised the issue,

2

public session, the town administrator read the plaintiff's Citizen Inquiry form and a portion of a response from the Town of Ashland's legal counsel, and Selectwoman Newton noted that the Board had decided to no longer address criticisms of the Board in public.

On June 18, 2018, in public session, a majority of the Board agreed to eliminate the Citizen Inquiry form. According to the plaintiff, between June 11, 2018 and July 3, 2018, he submitted another Citizen Inquiry form and various Right-to-Know Law requests seeking information as to what transpired during the nonpublic session at the June 4 meeting. See RSA ch. 91-A (2013 & Supp. 2020). On August 6, 2018, in response to the plaintiff's requests, the Board unanimously voted to unseal the minutes from the June 4 nonpublic session.

The plaintiff thereafter filed suit against the Selectwomen and the Board. He sought the dismissal of the Selectwomen from the Board, arguing that they violated their oaths of office by causing information to be divulged at the June 4 meeting that the Board had previously voted to withhold and that "adversely affected [his] relationships with members of the community." See RSA 42:1-a, II(a) (2012). He also requested, in part, that the trial court enjoin the Board from entering nonpublic session to discuss a person without providing notice of its intent to do so. See RSA 91-A:3, II(c). After submitting a response, the Selectwomen filed a motion for judgment on the pleadings, arguing that the information disclosed during the June 4 public session was not harmful to the plaintiff's reputation. Before the trial court ruled on that motion, the Selectwomen filed a motion for summary judgment. Attached to the motion for summary judgment were affidavits from the Selectwomen and Kathleen DeWolfe, who was a selectwoman in June 2018, averring that at the June 4 meeting they believed that the plaintiff's Citizen Inquiry form, a portion of the town counsel's response, and the Board's decision to change the Citizen Inquiry process could be disclosed in public session. See RSA 91-A:3, III.

The trial court denied the Selectwomen's motion for judgment on the pleadings, but granted summary judgment in their favor, reasoning that they did not improperly divulge any information and therefore did not violate their oaths of office. The Selectwomen filed a motion for attorney's fees, which the trial court denied. Separately, the Board filed a motion to dismiss for failure to state a claim, which the trial court denied. These appeals followed.

## II. Discussion

### A. The Selectwomen's Motion for Judgment on the Pleadings

We begin by addressing the Selectwomen's argument that the trial court erred by denying their motion for judgment on the pleadings. In general, a

we do not address it.

motion seeking judgment based solely on the pleadings is in the nature of a motion to dismiss for failure to state a claim upon which relief may be granted. LaChance v. U.S. Smokeless Tobacco Co., 156 N.H. 88, 93 (2007). In reviewing a motion to dismiss for failure to state a claim, we assume the truth of the facts alleged by the plaintiff and construe all reasonable inferences in the light most favorable to the plaintiff. Id. We need not, however, assume the truth of statements in the plaintiff's pleadings that are conclusions of law. Clark v. N.H. Dep't of Emp't Sec., 171 N.H. 639, 645 (2019). We then engage in a threshold inquiry that tests the facts in the complaint against the applicable law. Id. In conducting this inquiry, we may consider documents attached to the plaintiff's pleadings, documents the authenticity of which are not disputed by the parties, official public records, or documents sufficiently referred to in the complaint. Automated Transactions v. Am. Bankers Ass'n, 172 N.H. 528, 532 (2019). If the alleged facts do not constitute a basis for legal relief, we will reverse the denial of the motion for judgment on the pleadings. See LaChance, 156 N.H. at 93.

The Selectwomen argue that the plaintiff failed to adequately allege that the disclosed information would adversely affect his reputation as required to state a claim under RSA 42:1-a, II(a). We agree.

Resolving the Selectwomen's argument requires that we interpret RSA 42:1-a's language. Statutory interpretation presents a question of law, which we review de novo. Clark, 171 N.H. at 650. In matters of statutory interpretation, we are the final arbiters of the intent of the legislature as expressed in the words of the statute considered as a whole. Id. at 650-51. We first look to the language of the statute itself and, if possible, construe that language according to its plain and ordinary meaning. Id. at 651. We interpret legislative intent from the statute as written, and will not consider what the legislature might have said or add language that the legislature did not see fit to include. Id. When statutory language is plain and unambiguous, we need not look beyond the statute itself for additional evidence of legislative intent. Id.

We begin with the language of the statute. As relevant here, RSA 42:1 (2012) provides that any town officer who violates his or her oath of office "shall be . . . dismissed from the office involved." RSA 42:1-a allows the superior court to entertain petitions to dismiss a town officer for violating the oath. RSA 42:1-a, I (2012). The statute further provides, in relevant part:

> [I]t shall be considered a violation of a town officer's oath for the officer to divulge to the public any information which that officer learned by virtue of his official position, or in the course of his official duties, if:

4

(a) A public body properly voted to withhold that information from the public by a vote of 2/3, as required by RSA 91-A:3, III, and if divulgence of such information . . . would adversely affect the reputation of some person other than a member of the public body . . . .

RSA 42:1-a, II(a).

Accordingly, to state a claim under RSA 42:1-a, II(a) in this case, the plaintiff was required to plead that: (1) the Selectwomen divulged information to the public which they learned by virtue of their official positions or in the course of their official duties;[2] (2) the Board "properly voted to withhold that information from the public by a vote of 2/3, as required by RSA 91-A:3, III";[3] and (3) "divulgence of such information would . . . adversely affect the reputation" of the plaintiff. Id. For purposes of this appeal, we will assume, without deciding, that the plaintiff sufficiently pled the first two requirements. We therefore focus our analysis upon whether the plaintiff adequately alleged that the information divulged would adversely affect his reputation. See id.

Because "adversely" is not defined for purposes of RSA 42:1-a, we turn to the dictionary for guidance. See In re J.P., 173 N.H. 453, 463 (2020). The American Heritage Dictionary of the English Language defines "adverse" as "[c]ontrary to one's interests" or "harmful or unfavorable." American Heritage Dictionary of the English Language 25 (5th ed. 2011). The New Oxford American Dictionary similarly defines "adverse" as "harmful" or "unfavorable." New Oxford American Dictionary 24 (3d ed. 2010). Thus, divulged information "would adversely affect" the plaintiff's reputation if the information would be harmful or unfavorable to his reputation. RSA 42:1-a, II(a).

---

[2] Neither the Selectwomen, in their motion for judgment on the pleadings, nor the trial court, in its decision on that motion, expressly addressed whether the Selectwomen "divulged" information under RSA 42:1-a, II. The plaintiff's complaint alleges, based "upon information and belief," that the Selectwomen "caused the information they discussed to be divulged to the public," but that the town administrator "publicly divulged the matters that the [Board] discussed in the non-public session." Because neither the parties nor the trial court expressly raised the issue, we will assume, without deciding, that the plaintiff sufficiently alleged that the Selectwomen divulged information under RSA 42:1-a, II.

[3] RSA 91-A:3, III does not explicitly state that a recorded vote is required before previously withheld information may be disclosed. The statute requires that a recorded vote occur before a public body may withhold minutes and decisions reached in nonpublic session from public inspection. RSA 91-A:3, III. However, the statute requires no similar vote before withheld information may be disclosed. It provides only that the "information may be withheld until, in the opinion of a majority of members, the aforesaid circumstances no longer apply." Id. Although we need not, and do not, decide whether principles of statutory interpretation compel a recorded vote to occur before withheld information may be disclosed under the statute, and therefore whether the Board complied with the statutory process in this case, the legislature may wish to examine RSA 91-A:3, III and clarify whether a recorded vote is necessary.

5

In his complaint, the plaintiff alleges that the information disclosed at the June 4 public session adversely affected his reputation, in part because it "enable[d] the public to identify the subject of the meeting, the individual discussed during that meeting, and connect [the plaintiff's] name to the [Board's] policy changes, which impacted the entire public." During the public session at the June 4 meeting, the town administrator read the plaintiff's Citizen Inquiry and a portion of the town counsel's response, and Selectwoman Newton noted the Board's "decision to no longer address criticisms of the Board . . . in public."

By reading the plaintiff's Citizen Inquiry, the Board merely revealed that he took issue with the Selectwomen's treatment of him and voiced his grievance to the Board. We conclude that the disclosure of this information is insufficient, as a matter of law, to be harmful or unfavorable to a person's reputation, particularly given the facts and circumstances in this case. The plaintiff's complaint implies that, given the opportunity, he would have requested an open meeting such that the Board's discussion of his Citizen Inquiry would have occurred in public session, revealing the nature of his Citizen Inquiry, if not its substance. Similarly, had the Board or Selectwomen acceded to the plaintiff's demands set forth in his Citizen Inquiry — that the Board censure the Selectwomen and the Selectwomen issue the plaintiff a televised apology — the fact that the plaintiff submitted the Citizen Inquiry and the Citizen Inquiry's contents would have become public knowledge. We cannot conclude that the disclosed information, which the plaintiff himself took actions to make public, would be harmful or unfavorable to his reputation under RSA 42:1-a, II(a).

Furthermore, that the Board sought, received, and publicly disclosed the town counsel's advice regarding the plaintiff's Citizen Inquiry demonstrates that the Board took the plaintiff's concerns seriously and sought to appropriately and adequately address them. The June 4 public session minutes reveal that the town administrator explained that the town counsel's "main point was that [the Selectwomen] strongly disagreed with [the plaintiff] which is not formal censure and therefore does not warrant a public apology." Disclosing that the Board ensured the plaintiff's complaint was properly responded to by seeking legal advice would not be harmful or unfavorable to the plaintiff's reputation. Accordingly, we conclude that public disclosure of the plaintiff's own words and the town counsel's response to his demands did not adversely affect the plaintiff's reputation. RSA 42:1-a, II(a); cf. Touma v. St. Mary's Bank, 142 N.H. 762, 765 (1998) (concluding, in the defamation context, that a foreclosure notice improperly implying that the plaintiff was suffering "financial problems serious enough to warrant foreclosure would injure the plaintiff's reputation in the community").

Nor are we persuaded by the plaintiff's conclusory allegation that his reputation was adversely affected because the Selectwomen divulged the

6

information in a manner "that would enable the public to . . . connect [his] name to the [Board's] policy changes, which impacted the entire public." At the June 4 meeting at which the plaintiff's Citizen Inquiry was read, Selectwoman Newton simply announced the Board's decision to no longer publicly address criticisms directed at the Board, while also noting that the Board would "handle [such criticisms] in another way." The minutes of the June 18 meeting, at which the Board actually decided to eliminate the Citizen Inquiry process, do not reveal that the Board mentioned the plaintiff's name at all in connection with its decision. Thus, the plaintiff's identity was not linked to the Board's conclusion to eliminate the Citizen Inquiry process.

Although the Board ultimately decided to eliminate the Citizen Inquiry process, other means by which citizens could lodge grievances with the Board remained available to the public. Selectwoman Sharps explained at the June 18 meeting that these avenues included "contact[ing] the Town Administrator, fil[ing] a Right-to-Know [Law] request, or ask[ing] to be on the agenda and attend[ing] a meeting." Accordingly, even assuming that the basis for the Board's policy change could be connected to the plaintiff, the change had no impact on the public's ability to lodge complaints with the Board. Any association between the policy change and the plaintiff's identity, therefore, would not be harmful or unfavorable to his reputation.

The plaintiff also suggests that, because the Board voted to seal the minutes of the nonpublic session under RSA 91-A:3, III, divulgence of the information necessarily violated RSA 42:1-a, II(a). However, the Board's decision to withhold information from public inspection under RSA 91-A:3, III because it believed that such information "likely would affect adversely" a person's reputation has no bearing on our analysis of whether information disclosed was capable, as a matter of law, of adversely affecting a person's reputation under RSA 42:1-a, II(a). See Clark, 171 N.H. at 650-51 (explaining that in matters of statutory interpretation, this court is the "final arbiter[]" of the legislature's intent); see also Trustees of Dartmouth Coll. v. Town of Hanover, 171 N.H. 497, 508 (2018) (observing that the court is not bound by a town planning board's interpretation of the board's own regulations). Thus, public bodies should continue to vote to withhold information under RSA 91-A:3, III when warranted. Nonetheless, the scope of our review is not bound by a public body's incorrect conclusion that disclosure of certain information would likely harm an individual's reputation.

In sum, because we conclude that the information disclosed did not adversely affect the plaintiff's reputation, he failed to state a claim under RSA 42:1-a, II(a). The Selectwomen's motion for judgment on the pleadings therefore should have been granted.

## B. The Selectwomen's Motion for Attorney's Fees

We now turn to the Selectwomen's argument that the trial court erred by denying their motion for attorney's fees.  We review the trial court's decision concerning attorney's fees for an unsustainable exercise of discretion.  Fat Bullies Farm, LLC v. Devenport, 170 N.H. 17, 30 (2017).  To warrant reversal, the discretion must have been exercised for reasons clearly untenable or unreasonable to the prejudice of the Selectwomen.  Id.  In evaluating the trial court's ruling on attorney's fees, we give "tremendous deference" to its decision on whether to award fees.  Id. (quotation omitted).

The general rule in New Hampshire is that parties pay their own attorney's fees.  Id. at 29.  However, there exist two judicially-created exceptions to this rule: the bad faith litigation and substantial benefit theories.  Id. at 30.  The Selectwomen argue that they are entitled to attorney's fees under either theory.

Attorney's fees may be awarded under the bad faith litigation theory against a party who has acted in bad faith, vexatiously, wantonly, or for oppressive reasons, when the party's conduct can be characterized as unreasonably obdurate or obstinate, and when it should have been unnecessary for the prevailing party to have brought the action.  Id.  The purpose in awarding attorney's fees against a party who has acted in bad faith is to do justice, vindicate rights, and discourage frivolous lawsuits.  Id.

In support of their argument that the plaintiff acted in bad faith, the Selectwomen allege that the plaintiff sought to remove them from office through the electoral process, singled them out for litigation without bringing suit against the other Board members who were involved with the June 4 disclosure, and engaged in "substantial discovery," including "lengthy interrogatories," "extensive" document production requests, and "protracted depositions."  The trial court, however, after engaging in a "dispassionate review of the evidence," found that "[a]ll of the parties have litigated this case vigorously" and concluded that insufficient grounds existed to award attorney's fees under the bad faith litigation theory.  In light of the record, which includes only a portion of the parties' interrogatories, document production requests, and depositions, and the deference we accord trial courts in deciding whether to award fees, we cannot conclude that the trial court acted unreasonably by denying the Selectwomen attorney's fees under the bad faith litigation theory.  See Grenier v. Barclay Square Commercial Condo. Owners' Assoc., 150 N.H. 111, 118 (2003) (affirming trial court's decision not to grant fees under the bad faith litigation theory because the record supported the trial court's decision).

We observe that the plaintiff did not sue the town administrator or any of the other three Board members who were present at the meetings with which the plaintiff takes issue and on which his action is based.  Although bringing

8

suit solely against the two Selectwomen suggests that animus may have motivated this litigation, our prior cases make clear that "[a] plaintiff's motive in bringing an action . . . does not determine whether an action is frivolous" and that simply "bear[ing] the opposition ill will" provides an insufficient basis upon which to award fees against a party. Kukene v. Genualdo, 145 N.H. 1, 6 (2000).

The Selectwomen next argue that the substantial benefit theory entitles them to attorney's fees. Under the substantial benefit theory, attorney's fees may be awarded when a litigant's action bestows a substantial benefit not only on the party who litigated the action, but on the public as well. See Jesurum v. WBTSCC Ltd. P'ship, 169 N.H. 469, 482 (2016); Bedard v. Town of Alexandria, 159 N.H. 740, 744 (2010).

We first recognized the substantial benefit theory in Silva v. Botsch, 121 N.H. 1041 (1981). There, we found it appropriate to award fees to a selectman who "expended his own funds" to successfully bring an action against other select board members who attempted to remove him from a town planning board. Id. at 1042-43. Likening the case to a situation in which a trustee is entitled to fees for successfully litigating for the benefit of the trust as a whole, we reasoned that fees were justified because the selectman's actions "conferred a 'substantial benefit' on the" town and State. Id. at 1043. We have since applied the theory to other instances in which a public official has successfully prevented his or her removal from office. See Town of Littleton v. Taylor, 138 N.H. 419, 421, 424-25 (1994) (requiring a town to pay fees, under the substantial benefit theory, to a selectwoman who successfully defended against an action to declare her simultaneous employment as a town librarian and service as a selectwoman illegal); Foster v. Town of Hudson, 122 N.H. 150, 152 (1982) (requiring a town to pay fees, under the substantial benefit theory, to a police chief who successfully challenged an attempt to oust him from office).

Although the Selectwomen have successfully defended against an attempt to remove them from public office, we have rejected previous entreaties to apply the substantial benefit theory as a basis for awarding fees to government bodies or against private individuals. See Jesurum, 169 N.H. at 482-83; Bedard, 159 N.H. at 746. In Bedard, 159 N.H. at 746, we explained that "[a] governmental entity's responsibilities include protection of the public interest, and therefore, the award of attorney's fees for successfully meeting this responsibility is neither necessary nor warranted." Id. Accordingly, we declined to award fees under the theory to a town that successfully defended a declaratory property action brought by individual property owners. Id. at 741-42, 746. In Jesurum, 169 N.H. at 473-74, 482-83, an action between two private parties, we refused to grant fees under the theory to a plaintiff who won a judgment declaring that both he and the public had a prescriptive easement

over land owned by the defendant trust, observing that "such an award would be a substantial departure from our case law, as we generally do not grant fees against a private litigant absent a showing of bad faith."

Thus, although we agree that the Town of Ashland's residents benefited from the Selectwomen's successful defense of the plaintiff's attempt to remove them from public office, see Silva, 121 N.H. at 1043, it does not follow that they are entitled to fees under the substantial benefit theory. The Selectwomen seek to invoke the theory to justify an award of fees against a private party, an outcome we rejected in Jesurum. See Jesurum, 169 N.H. at 483. As we explained in Jesurum, "the cases in which attorney's fees have been imposed against a losing party under a public benefit theory generally involve situations in which the party bearing the fees is able to spread such costs amongst the persons who receive the benefit of the litigation." Id.; see, e.g., Claremont School Dist. v. Governor (Costs and Attorney's Fees), 144 N.H. 590, 596, 598 (1999) (awarding fees under the substantial benefit theory to a group of plaintiffs who sued the State and successfully established a constitutional right to an adequate education because the plaintiffs "conferred a significant benefit upon the general public, and it is thus the general public that would have had to pay the fees incurred if the general public had brought the suit").

The plaintiff sued the Selectwomen in their official capacities and, according to the Selectwomen, the Town of Ashland paid for their defense. Thus, because the public, which has benefited from the Selectwomen's defense, has already funded that defense, the rationale underlying the substantial benefit theory is already fulfilled. Cf. Silva, 121 N.H. at 1042-43 (awarding fees to a selectman who used his own funds to successfully prevent his removal from public office). Furthermore, because the Town of Ashland covered their costs, granting the Selectwomen fees under the theory would essentially be granting the town fees, which is "neither necessary nor warranted" when a town satisfies its responsibility to protect the public interest. Bedard, 159 N.H. at 746. Accordingly, we affirm the trial court's conclusion that the Selectwomen are not entitled to fees under either the bad faith litigation or substantial benefit theories.

## C. The Board's Motion to Dismiss

Finally, we address the Board's argument that the trial court erred by denying its motion to dismiss for failure to state a claim. As explained above, in reviewing a trial court's ruling on a motion to dismiss, we consider whether the allegations in the pleadings are reasonably susceptible of a construction that would permit recovery. Clark, 171 N.H. at 645. We assume the allegations in the plaintiff's pleadings to be true and construe all reasonable inferences in the light most favorable to him. Id. We will reverse the trial court's denial of a motion to dismiss if the facts pled do not provide a basis for legal relief. See id.

10

In his complaint, the plaintiff alleges that, before the Board entered nonpublic session, he was entitled to some form of notice that the Board intended to discuss matters which it believed would likely adversely affect his reputation, so that he could request an open meeting.  See RSA 91-A:3, II(c). The Board asserted in its motion to dismiss that RSA 91-A:3, II(c) does not impose upon it the obligation to provide such notice.  In denying the Board's motion, the trial court concluded that "[a] plain reading of the statute implies at least some form of notice."  It reasoned that the plaintiff's "right to request an open meeting on matters pertaining to him" under RSA 91-A:3, II(c) "'is rendered meaningless if [he] does not get an opportunity to exercise this right.'" (Quoting Johnson v. Nash, 135 N.H. 534, 538 (1992).)

On appeal, the Board renews its argument that RSA 91-A:3, II(c) does not require that a public board provide notice of its intent to discuss matters which would likely adversely affect an individual's reputation.  Addressing this issue requires that we interpret RSA 91-A:3, II(c).  We review a trial court's interpretation of a statute de novo.  Clark, 171 N.H. at 650.  When interpreting a statute, we look first to the language of the statute itself and, if possible, construe that language according to its plain and ordinary meaning.  Id. at 651.  We interpret legislative intent from the statute as written and will not consider what the legislature might have said or add language that the legislature did not see fit to include.  Id.

RSA 91-A:3, II(c) permits a public body to enter nonpublic session to consider or act upon "[m]atters which, if discussed in public, would likely affect adversely the reputation of any person, other than a member of the public body itself, unless such person requests an open meeting."  The statutory language does not require that a public body provide notice of its intent to enter nonpublic session to discuss matters which may adversely affect a specific person's reputation to afford the individual an opportunity to request an open meeting.  Rather, the notice provision of New Hampshire's Right-to-Know Law provides, with additional requirements and exceptions not relevant here, that "a notice of the time and place of each [public body] meeting, including nonpublic session, shall be posted in 2 appropriate places."  RSA 91-A:2, II (Supp. 2020).  The plaintiff's complaint does not allege that the Board failed to comply with RSA 91-A:2, II's notice requirements.

Because we will not read language into a statute that the legislature did not see fit to include, Clark, 171 N.H. at 651, we will not add language to RSA 91-A:3, II(c) requiring that a public body provide notice of its intent to enter nonpublic session to discuss a particular person.  See Brown v. Bedford School Board, 122 N.H. 627, 628-29, 631 (1982) (refusing to read into RSA 91-A:2 a personal notice requirement for probationary teachers who were not rehired following a discussion of their employment status at a meeting of a public body).  Had the legislature sought to require such notice, it would have done so

explicitly, as other states have done. Massachusetts' public meeting law, for example, expressly requires that, if a public body plans to meet in nonpublic session to discuss a person's "reputation, character, physical condition or mental health," that person must "be notified in writing by the public body at least 48 hours prior to the proposed" nonpublic session and be allowed to request a public session. Mass. Gen. Laws Ann. ch. 30A, § 21(a)(1) (West 2021); see La. Rev. Stat. Ann. § 42:17 (2021) (allowing a public body to meet in nonpublic session to discuss "the character, professional competence, or physical or mental health of a person" and requiring personal notice to that person so that they may request a public meeting).

The plaintiff, like our dissenting colleague, relies, in part, on Johnson, 135 N.H. 534, to argue that RSA 91-A:3, II(c) requires some form of notice that the Board intended to discuss him in nonpublic session. In Johnson, we interpreted a prior version of RSA 91-A:3, II(a), which allowed a public body to enter nonpublic session to consider or act upon "[t]he dismissal, promotion or compensation of any public employee or the disciplining of such employee, or the investigation of any charges against him, unless the employee affected requests an open meeting." Id. at 537 (quotation and emphasis omitted). We noted that "RSA 91-A:3, II(a), is grounded in a legislative concern for protecting the public employee from improper official conduct by compelling the government to make public the considerations on which its actions are based" and that "an employee's right to 'compel' public discussion of his or her termination is rendered meaningless if the employee does not get an opportunity to exercise this right." Id. at 537-38 (quotation omitted). "Because it would be unreasonable to expect public employees to attend every public meeting in which their termination could conceivably be considered," we concluded that a public body could not go into nonpublic session under RSA 91-A:3, II(a) "unless it ha[d] previously put that employee on notice" of the nonpublic session.[4] Id. at 538.

The plaintiff and our dissenting colleague contend that our reasoning in Johnson compels a similar interpretation of RSA 91-A:3, II(c) as requiring a public body to provide some form of notice of its intent to discuss an individual before it may meet in nonpublic session under that provision. We disagree. In Johnson, we based our analysis of RSA 91-A:3, II(a) upon the recognition of a specific and narrow "legislative concern for protecting the public employee from improper official conduct by compelling the government to make public the considerations on which its actions are based." Johnson, 135 N.H. at 537 (quotation omitted). We do not perceive a similar specific legislative concern

---

[4] Before Johnson was decided, the legislature amended RSA 91-A:3, II(a) to essentially its current form, which provides that a public body may enter nonpublic session to consider or act upon the dismissal, promotion, or compensation of, or the investigation of charges against, any public employee, "unless the employee affected (1) has a right to a meeting and (2) requests that the meeting be open, in which case the request shall be granted." RSA 91-A:3, II(a); see Laws 1992, 34:1; see also Laws 2008, 303:4 (adding a comma and pronoun).

12

underlying RSA 91-A:3, II(c).  Furthermore, the purpose of the Right-to-Know Law is to facilitate governmental transparency, see Lambert v. Belknap County Convention, 157 N.H. 375, 378-79 (2008), not to create personal rights to notice for individuals who may be discussed in a non-public session, cf. San Antonio v. Fourth Court of Appeals, 820 S.W.2d 762, 765 (Tex. 1991) (observing that the Texas Open Meetings Act "is not a legislative scheme for service of process" and "[t]he intended beneficiaries of the Act are not individual citizens, . . . but members of the interested public").

Indeed, we question to what extent Johnson has any precedential value, given that it was decided after the legislature amended the language in RSA 91-A:3, II(a) that we addressed in that opinion.  Nevertheless, the legislature did not, and has not, amended the statute to confer the broad rights of notice that the minority suggests that the "reasoning" of Johnson mandates.  Nor do we believe that this court (or the legislature, for that matter) ever intended to impliedly confer such an expansive right to notice upon an even broader category of citizens, i.e., "any person" who might seek to prevent a public body from entering into a nonpublic session upon the assumption that the body's discussions "would likely affect adversely [his or her] reputation."  RSA 91-A:3, II(c).  Beyond the practical implications of imposing such a rule, we, unlike our colleague, are unwilling to read language into the statute that the legislature did not see fit to include.  See Clark, 171 N.H. at 651.  Should the legislature disagree with our interpretation of RSA 91-A:3, II(c), it is, of course, "free, subject to constitutional limitations, to amend the statute."  State v. Dor, 165 N.H. 198, 205-06 (2013).

### III. Conclusion

For the reasons stated above, we affirm the trial court's decision denying the Selectwomen attorney's fees.  However, we reverse its decisions denying the Selectwomen's motion for judgment on the pleadings and the Board's motion to dismiss.

Affirmed in part; reversed in part; and remanded.

HICKS and BASSETT, JJ., concurred; HANTZ MARCONI, J., concurred in part and dissented in part.

HANTZ MARCONI, J., concurring in part and dissenting in part.  I agree with my colleagues that the plaintiff's complaint fails to adequately allege that the information the Selectwomen disclosed would adversely affect his reputation under RSA 42:1-a, II(a) (2012) and that the Selectwomen are not entitled to attorney's fees.  We part ways, however, on the question of whether RSA 91-A:3, II(c) (2013) required the Board to notify the plaintiff prior to its June 4, 2018 nonpublic session.  Given the purpose of, and our rules of

13

statutory construction regarding, the Right-to-Know Law, I would hold that, when a public body seeks to invoke RSA 91-A:3, II(c) to enter nonpublic session to discuss matters that would likely adversely affect a person's reputation, the public body must provide some form of notice to the person whose reputation would likely be adversely affected. Accordingly, I respectfully dissent from the majority's conclusion to the contrary.

The ordinary rules of statutory construction apply to our review of the Right-to-Know Law. CaremarkPCS Health v. N.H. Dep't of Admin. Servs., 167 N.H. 583, 587 (2015). When examining the language of a statute, we ascribe the plain and ordinary meaning to the words used. Id. We interpret legislative intent from the statute as written and will not consider what the legislature might have said or add language that the legislature did not see fit to include. Id. We also interpret a statute in the context of the overall statutory scheme and not in isolation. Id.

The Right-to-Know Law's purpose "is to ensure both the greatest possible public access to the actions, discussions and records of all public bodies, and their accountability to the people." RSA 91-A:1 (2013). Thus, the Right-to-Know Law "furthers our state constitutional requirement that the public's right of access to governmental proceedings and records shall not be unreasonably restricted." Censabella v. Hillsborough Cnty. Attorney, 171 N.H. 424, 426 (2018); see N.H. CONST. pt. I, art. 8. Accordingly, as we have often stated, "we resolve questions regarding the Right-to-Know Law with a view to providing the utmost information in order to best effectuate the statutory and constitutional objectives" of public access to governmental proceedings. Censabella, 171 N.H. at 426. As a result, we broadly construe provisions favoring disclosure and interpret exemptions restrictively. CaremarkPCS Health, 167 N.H. at 587.

The Right-to-Know Law provides that "all meetings . . . shall be open to the public." RSA 91-A:2, II (Supp. 2020). Public bodies, therefore, "shall not meet in nonpublic session, except for one of the purposes set out in paragraph II." RSA 91-A:3, I(a) (2013). RSA 91-A:3, II(c) — one of twelve exemptions set forth in paragraph II — permits public bodies to meet in nonpublic session to consider or act upon "[m]atters which, if discussed in public, would likely affect adversely the reputation of any person, other than a member of the public body itself, unless such person requests an open meeting." RSA 91-A:3, II(c); see RSA 91-A:3, II (Supp. 2020). This exemption, therefore, restricts a public body's ability to meet in nonpublic session, in that it cannot do so if the affected "person requests an open meeting." RSA 91-A:3, II(c).

When RSA 91-A:3 is construed in the context of the overall statutory scheme, requiring some form of notice to the person whose reputational interest justifies the public body entering nonpublic session under RSA 91-A:3, II(c) effectuates the Right-to-Know Law's overall purpose of promoting the "greatest possible public access to the actions, discussions, and records of all

public bodies." RSA 91-A:1; see White v. Auger, 171 N.H. 660, 666 (2019). A person cannot exercise the right to request an open meeting — and thereby prevent a public body from needlessly entering nonpublic session — when he or she lacks notice of the body's intent to enter nonpublic session to discuss "[m]atters which, if discussed in public, would likely affect adversely" his or her reputation. RSA 91-A:3, II(c). Giving full effect to the language the legislature saw fit to include, in my view, requires notice to such individuals. See CaremarkPCS Health, 167 N.H. at 587.

The majority concludes, to the contrary, that RSA 91-A:3, II(c) does not require notice to the person whose reputational interests prompt the public body to enter nonpublic session "to afford the individual an opportunity to request an open meeting." This conclusion rests, at least in part, on the premise that because RSA 91-A:3, II(c) does not contain an express notice requirement, such notice is not required. In my view, the majority's reading of RSA 91-A:3, II(c) contravenes both our rules of statutory construction and the sole purpose of the Right-to-Know Law.

RSA 91-A:3, II(c) balances the public's right to know with the privacy interests of a person whose reputational interests would likely be adversely affected if a particular matter were discussed in public. See RSA 91-A:3, II(c). Under paragraph II(c), the preservation of a person's reputational interest is the sole justification for a public body entering nonpublic session. RSA 91-A:3, II(c). Where the affected person would rather the discussion remain open to the public, that justification evaporates and the public body is no longer entitled to meet outside of public view. See RSA 91-A:3, I(a), II(c); Ettinger v. Town of Madison Planning Bd., 162 N.H. 785, 788 (2011) ("A public body bears the burden of proving that it may hold a nonpublic assembly of its members."). Absent notice, giving the affected person an opportunity to request an open meeting, the majority's interpretation will, essentially, lead to more discussions occurring outside of public view, contrary to the purpose of the Right-to-Know Law. See RSA 91-A:1.

As the majority acknowledges, the plaintiff's complaint suggests that he would have requested an open meeting had he known that the Board intended to enter nonpublic session to discuss matters that would likely adversely affect his reputation. Thus, the Board's discussion during the June 4 nonpublic session appears to have been unjustifiably concealed from public view. To me, this result, one that the majority appears to endorse, is contrary to the statutory and constitutional objectives of public access to governmental proceedings. See N.H. CONST. pt. I, art. 8; RSA 91-A:1; see also Censabella, 171 N.H. at 426.

Additionally, if the majority's reading of RSA 91-A:3, II(c) is correct, the legislature's addition of "unless such person requests an open meeting" is meaningless. RSA 91-A:3, II(c). The practical consequence of the majority's

decision is that an individual will likely never have the opportunity to request an open meeting under RSA 91-A:3, II(c). Without some sort of notice, the person whose reputational interests prompt the public body to enter nonpublic session does not know about his or her right to request an open meeting. It is difficult to imagine that the legislature, in drafting RSA 91-A:3, II(c), intended to create a statutory right that cannot be exercised. See White, 171 N.H. at 666 ("The legislature is not presumed to waste words . . . ."). Requiring that a public body notify the affected person of its intent to enter nonpublic session to discuss matters that would likely adversely affect the person's reputation allows him or her to exercise the right created by RSA 91-A:3, II(c), advances the principles of open government embodied in our Right-to-Know Law, and gives full effect to the legislature's choice of words. See id.; Censabella, 171 N.H. at 426.

Although our principles of statutory construction regarding the Right-to-Know Law, and its purpose, are sufficient to persuade me that the plaintiff was entitled to notice of the nonpublic session under RSA 91-A:3, II(c), I find further support for my position in our decision in Johnson v. Nash, 135 N.H. 534, 537-38 (1992) (reading a notice requirement into the language of RSA 91-A:3, II(a), which has since been amended). Johnson involved a meeting of the Town of Middleton select board at which the selectpersons entered nonpublic session to discuss the termination of the plaintiff, a town employee, without providing him notice of its intent to discuss his employment at its meeting or in nonpublic session. Id. at 535. Upon reentering public session, two of the three selectpersons voted to terminate the plaintiff. Id. The other selectperson, "who warned his colleagues that firing the plaintiff in this manner was illegal," abstained. Id.

At the time, RSA 91-A:3, II(a) permitted public bodies to enter nonpublic sessions to consider or act upon "[t]he dismissal, promotion or compensation of any public employee or the disciplining of such employee, or the investigation of any charges against him, unless the employee affected requests an open meeting." Id. at 537 (quotation omitted). The two selectperson-defendants argued on appeal that "personal notice [to the plaintiff] was not required" because "the statute did not explicitly create an affirmative duty for them to inform the plaintiff that a motion would be made to consider his termination in [nonpublic] session." Id. We disagreed, explaining that, "[c]learly, an employee's right to 'compel' public discussion of his or her termination is rendered meaningless if the employee does not get an opportunity to exercise this right." Id. at 537-38. Therefore, we held that "a governmental body may not move to go into [nonpublic] session for the purpose of considering the termination of a public employee unless it has previously put that employee on notice that such a motion would be made." Id. at 538.

Johnson supports my interpretation of RSA 91-A:3, II(c) because, construing language that is identical to the language of RSA 91-A:3, II(c) in all

16

relevant respects, we reached the opposite result there than that reached by the majority here.  See id. at 537-38; see also RSA 91-A:3, II (only two of the twelve exemptions — paragraphs (II)(a) and (II)(c) — afford affected persons the right to prevent nonpublic session).  The Board suggests, and the majority infers, that Johnson is distinguishable from this case because Johnson involved a public employee's interest in his employment, whereas this case involves an individual's reputational interest.  The majority contends that, in reading a notice requirement into the language of RSA 91-A:3, II(a), our analysis in Johnson rested upon "a specific and narrow 'legislative concern for protecting the public employee from improper official conduct by compelling the government to make public the considerations on which its actions are based.'"  (Quoting Johnson, 135 N.H. at 537.)

Even if I agreed that Johnson's analysis of RSA 91-A:3, II(a) rested solely upon so narrow a ground, RSA 91-A:3, II(c) is rooted in a legislative concern for protecting a person's reputation — an interest at least as significant as the public employment interest at issue in Johnson, if not more significant.[5]  See State v. Veale, 158 N.H. 632, 638-39 (2009) (finding "ample support in our jurisprudence for the proposition that reputational stigma can, by itself, constitute a deprivation of liberty deserving due process" under the State Constitution); cf. Appeal of Alexander, 163 N.H. 397, 407 (2012) ("[W]e have repeatedly reaffirmed that, as a matter of State law, public employment without more, such as a commission of office, does not rise to the level of a protected property right" for due process purposes.).  Accordingly, if the specific legislative concern at issue in Johnson warranted our reading a notice requirement into the language of RSA 91-A:3, II(a), as the majority contends, I see no reason why the reputational interest underlying RSA 91-A:3, II(c) would not likewise require notice to affected persons.

---

[5] That the information disclosed by the Selectwomen could not adversely affect the plaintiff's reputation does not alter my belief that, prior to entering nonpublic session, the Board was required to provide the plaintiff notice of its intent to do so under RSA 91-A:3, II(c).  The right to request an open meeting is triggered by a public body's decision to enter nonpublic session to discuss matters that would likely adversely affect a person's reputation — not the result of a court's post hoc determination as to the actual adverse effect.  See RSA 91-A:3, II(c) (2013).